MARATHON BATTERY COMPANY, Oklahoma Tire and Supply Company and McCrory Corporation, Plaintiffs in Error,

v.

Lloyd C. KILPATRICK, Defendant in Error.

No. 40675.

Supreme Court of Oklahoma.

Dec. 28, 1965.

Rehearing Denied July 11, 1966.

Application for Leave to File Second Petition for Rehearing Denied Oct. 18, 1966.

Houston, Klein & Davidson, Tulsa, for plaintiffs in error.

Jesse L. Leeds, Norman & Wheeler, Muskogee, for defendant in error.

BERRY, Justice.

This action originally was brought against Oklahoma Tire & Supply Company, hereinafter designated as "Otasco", and Marathon Battery Company, referred to as "Marathon". The action, filed July 7, 1962, sought to recover damages for personal injuries alleged to have resulted from breach of implied warranty by the named defendants. Subsequently, November 21, 1962, plaintiff was granted leave to

file supplemental petition naming Mc-Crory Corporation, hereafter denominated as "McCrory", an additional party defendant, for the reason such corporation owned some interest and exercised some management and control over defendant Otasco. Jurisdiction was obtained over McCrory, a domesticated corporation, by service upon J. G. H., the service agent. The matters hereafter summarized are disclosed by the pleadings.

Concerning essential allegations, the plaintiff alleged Marathon, a Wisconsin corporation, was doing business in Oklahoma, having manufactured and placed such item for sale to the general public through various retailers, and the trial court had jurisdiction over this defendant under the provisions of 18 O.S.1961, § 1.204a. As concerned Otasco, it was alleged such defendant at all times was a Delaware corporation, authorized to do and doing business in this State at all times pertinent to this action, whose service agent was J. G. H., a resident of Oklahoma City, Oklahoma.

On June 21, 1961, plaintiff purchased a 6-volt dry cell lantern battery from Otasco's retail store in Muskogee, Oklahoma. This battery had been manufactured and sold to Otasco by Marathon, a Wisconsin corporation, which neither had domesticated in Oklahoma nor appointed a service agent in this State. Otasco had sold this battery to plaintiff in the usual course of defendant's retail business. On December 29, 1961, plaintiff was holding the battery in his hand when an explosion occurred, blowing the top portion of the battery off and resulting in painful and permanent injuries, particularly to his thumb and the two forefingers of his right hand, which partially were blown away. The petition charged Otasco with acting as exclusive selling agent of Marathon, and that both mutually engaged in business for profit, Marathon in manufacturing and Otasco in sale of the product; that in manufacture and sale of the battery defendants had been guilty of breach of implied warranty of fitness as to material, workmanship,

freedom from latent defects, proper construction, manufacture and testing before being offered for sale; that the battery was a technical mechanism of which defendants had special knowledge, and thereby impliedly warranted that there were no defects which would be harmful; that no warning was given that plaintiff need be alarmed for his personal safety, and no patent defects appeared which plaintiff could ascertain by examination. The petition further alleged the circumstances surrounding the explosion, physical injuries and the nature and extent of personal damages which plaintiff had suffered.

Both Marathon and Otasco filed Motions to Quash and Plea to the Jurisdiction and Venue. Marathon's motion, supported by affidavits, denied jurisdiction upon grounds defendant neither was domesticated nor doing business within the State at any time referred to in the petition. Both motions were heard and overruled. Thereafter, each defendant filed a General Demurrer and a Motion To Make Definite And Certain.

Marathon's motion sought to require plaintiff to state what business defendant was doing at the times alleged, and if unable to so state, that all references to defendant's doing business in this State be stricken; and that plaintiff be required to state with particularity the basis for the allegation that Marathon and Otasco were mutually engaged in business for profit, and if unable to do so then such allegations be stricken. Otasco's motion similarly was directed to the allegation relative to defendants' mutual engagement in business. The motions and demurrers were heard and overruled by the trial court.

Marathon, reserving all objections to venue and jurisdiction, answered by general and specific denial that Otasco or anyone in its behalf were "mutually engaged in a business for profit". Defendant Otasco filed essentially the same answer, and specifically denied anyone in its behalf or at any time acted as agent, servant or employee of Marathon, or that defendants

were mutually engaged in any business for profit.

Thereafter (October 26, 1962) Otasco filed amended answer alleging it was not incorporated or in existence in June, 1961; that it had incorporated in the State of Delaware on December 29, 1961, but neither was domesticated nor authorized to do business in this State on that date; that on neither date in 1961 was defendant engaged in any business in this State, particularly pleading the facts in support of such allegations.

Plaintiff replied by general denial of matters asserted by defendants' answers, and then alleged that although during a short portion of 1961 Otasco had been merged into another corporation it still continued to hold itself out as Oklahoma Tire and Supply Co., and to do business at the same locations, with same personnel and purpose of existence; that the subsequent incorporation in January, 1962, was only an extension and continuation of the former corporation and defendant, therefore, was liable for obligations of the former company.

Following filing of the supplemental petition, alluded to above, each defendant filed combined motions to strike, made definite and certain, demurrer and special demurrer, adopting those pleadings directed at the original petition. Upon these pleadings being overruled defendants moved to require plaintiff to elect between the theory of breach of implied warranty and res ipsa loquitur, and that the inconsistent theory be ordered stricken from consideration.

Each defendant filed separate answer. Marathon, preserving its objections to jurisdiction and venue of the trial court, answered, denying: (1) Otasco or its agents, servants or employees at any time were employed by or responsible to defendant, or that Otasco and Marathon at any time were engaged in business for mutual gain; (2) that either an express or implied warranty was made to plaintiff. The answer affirmatively alleged the battery was manufactured in compliance with recognized standards and exceeded minimum requirements, was not negligently constructed and not capable of exploding, so that in the event same exploded this was caused by an outside substance; there was neither an apparent nor latent defect in the battery when delivered to Otasco, same being harmless and not inherently dangerous or subject to explosion; and res ipsa loquitur could not apply.

Defendant Otasco, preserving questions of jurisdiction and venue, answered denying its employees were acting for or in behalf of Marathon, or mutual engagement with that defendant in business for profit. This defendant alleged the Otasco sued herein was not in existence in June, 1961, and although incorporated in Delaware in December, 1961, was neither domesticated nor authorized to do business in Oklahoma; that defendant did not own or operate retail stores, have assets, sell merchandise or engage in any business in Oklahoma in December, 1961; that if plaintiff's attempt was to sue the original Otasco corporation that had ceased to exist in 1960, then plaintiff had no service upon a defendant which did not exist when the cause of action arose; that the doctrine of res ipsa loquitur could not apply in this case.

Defendant McCrory denied jurisdiction of the trial court and allegations of the petition, and further specifically denied that: such defendant in any manner or during times alleged acted in behalf of the other defendants, or that it was engaged mutually with Marathon in business for profit; either McCrory or Otasco at any time made any warranties or representations to plaintiff, express or implied. Defendant affirmatively alleged on the date of sale to plaintiff by Otasco the battery was in same condition as when purchased from Marathon, and denied res ipsa loquitur could apply in the case.

The issues to be tried were completed by plaintiff filing reply denying every allegation asserted in defendants' answers.

Under this record no need exists to consider questions bearing upon amenability to

suit of a corporation legally dissolved but which continues to do business without generally advising that it is no longer a legal entity. Nor do we consider the legal effect of holding over after legal dissolution, or the applicability of newly enacted statutes to a previously dissolved corporation under such circumstances.

The original Oklahoma Tire & Supply Company was incorporated as a Delaware corporation in 1928, domesticated in Oklahoma, and did business in the State until legal dissolution in 1960. The registered service agent of that corporation was A. H. M. of Oklahoma City, Oklahoma. In December, 1960, this corporation was merged into McCrory Corporation, which then domesticated in Oklahoma on February 22, 1961. The registered service agent of this corporation was J. G. H. On November 7, 1961, Otasco was organized as a Delaware corporation and domesticated in Oklahoma on January 9, 1962, as an inactive corporation, whose registered service agent was M. F. of Oklahoma City, Oklahoma. Summons was issued for Oklahoma Tire & Supply Company directing service to be made upon J. G. H. and served upon this party as registered service agent of Otasco.

Assuming for discussion that Otasco, although legally dissolved, was amenable to process within the State when summons issued and was served, applicable law required service be made upon the service agent appointed for that purpose. 18 O.S. 1961, § 475.1. The statutory service agent for the old Otasco was A. H. M. in Oklahoma City. Upon domestication of the new Otasco (January 9, 1962) a different party, (M. F.), was designated service agent. However, neither the original service agent nor the newly appointed agent were served. Purported service was had upon the designated service agent of McCrory.

■ Our decisions upon the question were based upon statutes since repealed or amended by the Business Corporation Act, 18 O.S.1961, § 1.1 et seq. However, the uniform rule has been that when the action is against a corporation, and the statutes specify the officer or agent upon whom process must be served, the service must be upon the party designated or the attempted service will not confer jurisdiction. Oklahoma Fire Insurance Co. v. Barber Asphalt Pav. Co., 34 Okl. 149, 125 P. 734; Hilliard v. St. Louis & S. F. R. Co., 98 Okl. 122, 223 P. 877; Kingkade Hotel Co. v. Keggin, 208 Okl. 464, 257 P.2d 504; Magnolia Pet. Co. v. Evans Lbr. Co., Okl., 351 P.2d 1067.

■ In Magnolia, supra, the applicable statute was 18 O.S.1961, § 1.17, now Statutes of 1961. The issue was whether a distinction existed between the requirements of 12 O.S.1961, § 163, providing the mode and manner by which process may be served upon corporations, and Sec. 1.17, supra, which provides for service upon the registered agent of either domestic or foreign corporations. After consideration of prior decisions, we concluded that a distinction exists between the summons authorized under Sec. 163 and that provided for under Sec. 1.17, and the methods authorized under these statutes were not intended as cumulative. We determined the Legislature intended to provide that foreign corporations should designate some person upon whom process could be served in actions brought against the corporation, and service of process should be made upon such designated person. No reason appears why this rule should not govern here. No service was had upon Otasco sufficient to confer jurisdiction upon the trial court. The trial court erred in overruling Otasco's special appearance, motion to quash and plea to the jurisdiction. The judgment accordingly is reversed as to the named defendant.

Next to be considered is the contention the trial court had no jurisdiction over Marathon because this defendant was not "doing business" within the State at any time covered by allegations of the petition. Summons was served upon Marathon by serving the Secretary of State in compliance with provisions of 18 O.S.1961, § 1–204, which authorizes such service upon

a foreign corporation "doing business" or "having done" business within the State.

Marathon attacked this statutory, substituted service by special appearance to quash service of summons and plea to the jurisdiction and venue. The argument supporting this contention is offered under two topical subdivisions, "A" thereunder being based upon affidavits of Marathon's president (McEachron) and of an employee (Marks) of Otasco. These affidavits were to the effect defendant was not domesticated, licensed, or doing any business in this State as alleged, and that Otasco did not purchase merchandise from defendant on credit or consignment. It is argued that because these affidavits were not controverted by evidence or counter-affidavits same must be taken as true, and it was reversible error for the trial court to overrule defendant's motion and special plea to the jurisdiction. Subdivision "B" of this contention urges error of the trial court in assuming and retaining jurisdiction over this defendant, a foreign corporation not doing business in the State at any time material to the present action.

As respects "A", the argument is that plaintiff failed to present counter-affidavits or evidence in response thereto. Defendant says the matters reflected in such affidavits must be taken as true, and the plea to jurisdiction to venue improperly was overruled. The rule stated in Kenitex Corporation v. Coryell, Okl., 352 P.2d 894 is cited as authority for this argument. It is our opinion the rule urged, based upon earlier decisions cited, is subject to recognized limitation which prevents application of Kenitex, supra, as decisive. However, as the issue is determined otherwise, it is not necessary to deal further with this argument.

Marathon's argument is that it was not doing business in this State at any time germane to plaintiff's cause of action. Testimony of a company vice-president was that defendant had no representatives in the State, although representatives were present in April, 1962. Company sales-men went into other states, but the witness did not know whether they came into Oklahoma. The witness did not know whether defendant used printed advertising media, how Otasco learned defendant sold and could supply batteries for sale at retail, or how defendant made contact with Otasco in this State. Defendant was a well-known manufacturer throughout the country, and the contact could have been made by salespeople who called upon large distributors.

The manager of the Muskogee store knew this was the only local store handling defendant's batteries, and acquired them for retail sale by requisition from Otasco's Tulsa warehouse. He knew of no circulars or brochures circulated by defendant, other than literature packed in the boxes with the batteries. So far as disclosed by this record, Otasco acquired defendant's batteries by means of written purchase orders mailed to defendant's factory where the orders were filled and the merchandise shipped f. o. b., Wausaw, Wisconsin. The contention is that the trial court was without jurisdiction to render any judgment against defendant, since nothing appears to support a finding defendant was doing business within this State under the facts disclosed by the record when measured by the decisions of this Court in: Harrell v. Peters Cartridge Co., 36 Okl. 684, 129 P. 872, 44 L.R.A.,N.S., 1094; Wills v. National Mineral Company, 176 Okl. 193, 55 P.2d 449; S. Howes Co. v. W. P. Milling Co., Okl., 277 P.2d 655.

■ What constitutes doing business in the state, in the sense that a foreign corporation becomes amenable to process and subject to rendition of a judgment in personam, continues to pose a vexing problem when considered. As with courts of other jurisdictions, we have recognized that there exists no precise rule for determination, and each case must depend upon the character of its particular facts. See the Wills and W. P. Milling Co. cases, supra. Situations which provoke inquiry as to whether a foreign corporation is to be found to be doing business ordinarily fall within three classifi-

cations: (1) service of process; (2) taxation; (3) qualification. See 20 C.J.S. Corporations § 1828. We recognized such classifications in W. P. Milling Co., supra.

By general understanding, a foreign corporation is a legal entity which can have no existence beyond the boundaries of the state which authorized its being, except through comity. If corporate powers and franchises could be exercised in other states without restriction, the advantage so acquired ultimately would permit the business in those states to be controlled by corporations created by other states. Paul v. Virginia (U.S.1869), 8 Wall. 168, 19 L.Ed 357. The obvious need for providing a legal basis to support entry of in personam judgments against foreign corporations in the host forum has dictated that reasonable and proper means be devised for holding such corporations amenable to process. From this need evolved the premise that the least degree of doing business within the state of the forum will permit service of process upon foreign corporations, under statutory authorization, sufficient to support judgment in personam. Originally this premise contemplated the business done be of such character as warranted the inference of actual corporate presence in the jurisdiction where service of process was attempted. Bank of America v. Whitney Bank, 261 U.S. 171, 43 S.Ct. 311, 67 L.Ed. 594.

Historically, over an extended period courts generally reached varying conclusions based upon different reasoning when dealing with the matter of judicial power of the courts in respect to controversies between citizens of the forum state and foreign corporations. See "An Analysis of Doing Business", 25 Col.L.R. 1018. Application of principles of due process served to limit the power of state courts to enter binding judgments against persons or legal entities, not served with process within the forum state. Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565. As mentioned in McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223, where the line of limitation falls with respect to foreign corporations has provided a source of prolific controversy. At p. 222, at p. 200 of 78 S.Ct. of the cited case is this observation:

" * * * In a continuing process of evolution this Court accepted and then abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over such corporations. * * * "

That court then observed that in the long history of litigation there appeared a discernible trend toward extending the scope of state jurisdiction over foreign corporations, this being attributable to fundamental transformation of the national economy. Increasing nationalization of commerce across the continent increased the amount of business transacted by mail across state lines. Likewise, modern transportation and communication make it less burdensome for a corporation to defend in a state where engaged in economic activity. Upon these considerations it is now held to discharge requirements of due process if the suit involved is based upon a contract which had a substantial connection with the state of the forum. See McGee v. International Life Ins. Co., supra, and authorities at p. 226, 78 S.Ct. 199. The following recent decisions of other courts adequately reflect the discernible trend expanding the permissible jurisdiction over foreign corporations. Within our jurisdiction compare Harrell v. Peters Cartridge Co., and S. Howes Co. v. W. P. Milling Co., supra, as disclosing this trend.

In International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 85, 161 A.L.R. 1057, a foreign Missouri corporation manufactured shoes which were sold by resident salesmen employed to solicit orders within the state. Notice of assessment for tax purposes was served personally upon one salesman, and a copy mailed to the corporation offices in Missouri. The corporation resisted the state's right to make any assessment upon the ground that it was not doing business in the state and there was no agent upon whom process could be served. In affirming the

state's right to assess the foreign corporation, the Supreme Court determined the corporation was amenable to service of process; and that requirements of due process did not require such defendant to be present within jurisdiction of the court if there were such contacts with the territorial forum that maintenance of suit did not offend traditional notions of fair play and substantial justice. The Court observed that casual presence of an agent in the state, or conduct of isolated activities in the corporation's behalf, are insufficient to support suit on a cause of action not connected with corporate activities. But, presence in the state sufficient to support constitutional liability to suit may be determined when activities in the state have been systematic and continuous and give rise to the liability sued upon, although neither consent to be sued nor authorization of an agent to accept service of process has been given.

Perkins v. Benguet Consolidated Mining Co., 324 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485, involved a Philippine corporation whose activities were stopped during the war. The president, who was general manager and a stockholder, maintained the corporate office in his Ohio home, transacted business with secretarial assistance and maintained corporation bank accounts within the state, but no corporate business involved any property within the state. The Supreme Court held that it would not violate due process requirements for Ohio to take or decline jurisdiction, where the president had been served personally in an action by a stockholder against such corporation.

This decision was followed by McGee v. International Life Ins. Co., supra. Deceased, resident of California, purchased a life insurance policy by mail from an Arizona insurer in 1944. Those obligations later were assumed by defendant, a Texas corporation. This company offered by mail to reinsure insured according to terms of the original policy and this offer was accepted. The insured paid premiums by mail from California until his demise in 1950, at which event the (wife) beneficiary made proof of death but the insurer denied liability. Neither the original insurer nor the Texas (successor) defendant had offices or agents in California, nor had the defendant solicited or done insurance business in that State other than the policy involved. The benefit claim was reduced to judgment under process served by registered mail on the Texas defendant as authorized by a California statute applicable to foreign insurance companies. The judgment was uncollectible and the plaintiff then went to Texas and filed suit to recover upon the judgment but was denied relief.

In reversing the judgment of the Texas Court, the Supreme Court observed that due process did not preclude the California Court from entering a binding judgment against respondent insurer, it being sufficient the action was based upon a contract which had a substantial connection with that state since delivered there, the premiums had been mailed from there and the insured was resident of the state at death. The state had a manifest interest in providing an effective means of redress for its citizens under such circumstances, since they would be at a distinct disadvantage if forced to follow a foreign corporation to a distant jurisdiction to enforce a claim, which if of small or moderate amount would result in making the company judgment proof.

Hanson, etc. v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, although concerned primarily with questions of in rem jurisdiction of the State of Florida over assets of a Delaware trust, gave consideration to those cases above cited. The court again noted the trend to expansion of jurisdiction over nonresidents occasioned by economic changes, so that requirements for jurisdiction of nonresidents had been altered from the rigid rule in Pennoyer v. Neff, supra, to the flexible standard of International Shoe Company, supra. But, the court also said it was not to be assumed such trend heralded eventual demise of all restrictions over personal jurisdiction of state courts. Vanderbilt v. Vanderbilt. 354 U.S.

416, p. 418, 77 S.Ct. 1360, 1 L.Ed.2d 1456. The Court further stated:

" * * * Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defendant in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him. See International Shoe Co. v. State of Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95 [,103,] [161 A.L.R. 1057]."

The court expressly found a lack of "minimal contacts" in Hanson, holding the cause of action asserted was not one arising out of an act done or transaction consumated in the forum state. It was observed that restrictions on personal jurisdiction of state courts are a consequence of territorial limitations upon the power of the states. And, no matter how minimal the burden of defending in a foreign tribunal, a defendant cannot be called upon to defend unless there exists the "minimal contacts" with the particular state that are prerequisite to the exercise of judicial power over such defendant.

In Gray v. American Radiator, etc. Corp., 22 Ill.2d 432, 176 N.E.2d 761, a resident of Illinois sought damages for injury resulting from explosion of a water heater. A safety valve had been manufactured by an Ohio corporation and sold to defendant, a Pennsylvania corporation, which incorporated such valve into a hot water heater which was sold to plaintiff in Illinois. Process was served upon the Ohio corporation under statute providing that a nonresident who, in person or by an agent, committed a tortious act within Illinois submitted to jurisdiction in that State. The critical questions were whether defendant had committed a tortious act within the state within the meaning of the statute despite the fact defendant had no agent in the state; and whether the statute

involved, if so construed, violated due process. The court held the factor of doing a substantial volume of business had been minimized by McGee, supra, and the doing of a given volume of business did not provide the only means by which a nonresident could establish requisite minimum contacts with Illinois sufficient to support jurisdiction. The court found it was a reasonable inference defendant's commercial transactions resulted in substantial use and consumption within Illinois. And, to the extent the corporation's business might be affected directly by transactions within the state, it enjoyed benefits to some degree from the protection extended by Illinois laws. The court reasoned further:

"Where the alleged liability arises, as in this case, from the manufacture of products presumably sold in contemplation of use here, it should not matter that the purchase was made from an independent middleman or that someone other than defendant shipped the product into this State.

"With the increasing specialization of commercial activity and the growing independence of business enterprises it is seldom that a manufacturer deals directly with consumers in other States. The fact that the benefit he derives from its laws is an indirect one, however, does not make it any the less essential to the conduct of his business; and it is not unreasonable, where a cause of action arises from alleged defects in his product, to say that the use of such products in the ordinary course of commerce is sufficient contact with this State to justify a requirement that he defend here."

In Smyth v. Twin State Improvement Corp., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193, the action was brought to recover for tort committed by a foreign corporation, process being served under authority of statute providing for service upon Secretary of State where the foreign corporation committed tort within the state. In upholding the statute authorizing substituted service as

being within the state's power and not violative of due process, that Court observed:

"No sound reason appears to exist why foreign corporations may not be held responsible in Vermont for wrongful acts done in Vermont. If a foreign corporation voluntarily elects to act here, it should be answerable here and under our laws. The consequences imputed to it lie within its own control, since it need not act within this state at all, unless it so desires."

Further exposition of the reasoning upon which the same result is reached may be observed in Compania De Astral, S. A. v. Boston Metals Co., 205 Md. 237, 107 A.2d 357, 108 A.2d 372, 49 A.L.R.2d 646; Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L. Ed. 1091; Travelers Health Association v. Commonwealth of Virginia, etc., 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154.

■■ The business activities by which defendant Marathon's products came into the State for retail sales by Otasco are outlined above. That defendant could, and undoubtedly would, have sought relief in Oklahoma courts, had necessity arisen to protect its rights in respect to commercial transactions with Otasco reasonably can be presumed. We are not required to consider what the result would be if a single, isolated transaction were involved. The evidence reflects a continuing series of transactions, although it may be understood the volume of business within this State is not the only method which may be considered as establishing the necessary contacts to support the propriety of statutory service of process upon this foreign defendant. The consequences imputed to defendant were within its own control. There was no need for it to act in this State at all unless it desired to do so. The commodity was manufactured and shipped here by Marathon to a retailer for sale and distribution in this State.

The burden laid upon a citizen of this State, when met with jurisdictional objections while seeking to enforce rights arising from the tort of a foreign corporation, is more compelling than the plea that such for-eign corporation should not be required to defend its tortious act because not physically present and therefore not amenable to process. Common justice requires such corporation to appear and defend its acts in our courts when those acts are the basis of the action and there is legal justification for the process, and no ground exists for any claim the defendant was deprived of notice or right to appear and defend.

We hold defendant was amenable to process served as authorized by statute which neither permitted hostile discrimination against defendant nor imposed unlawful restriction upon conduct of its business. Prior decisions such as Harrell v. Peters Cartridge Co., 36 Okl. 684, 129 P. 872; Wills v. National Mineral Co., 176 Okl. 193, 55 P.2d 449; S. Howes Co. v. W. P. Milling Co., Okl., 277 P.2d 655, and other decisions in conflict with the rule herein announced are hereby overruled.

Defendant's principal contention is that the trial court erred in overruling demurrers to plaintiff's evidence, motions for directed verdict and motion for new trial. Summarized, defendants' theory is that even should it be assumed plaintiff established existence of implied warranty of merchantable quality and fitness for the general purpose for which manufactured, nevertheless plaintiff failed to prove breach of such warranties because it was not established this battery was: (1) negligently made; (2) defective when sold; (3) harmful when used as intended; (4) or that any negligence or defect was the proximate cause of injury. Defendants conclude plaintiff failed to prove the battery, a sealed container, was defective when sold or at all, thus there was a lack of evidence to establish the battery was defective or that the explosion was the proximate cause of injury and so plaintiff cannot recover. The arguments involve the weight and value of the evidence and require some recitation of testimony relative to particular issues advanced.

As concerns portions of the problem, the evidence showed plaintiff purchased a 6-volt battery, manufactured by defendant and

shipped to the retailer, from the open stock upon a display rack in Otasco's store. Thereafter this battery was put to the uses for which intended including, on the day of the accident, the testing of ornamental light bulbs by connecting wires from the battery posts to the light bulbs. While holding a bulb in one hand and the battery in the other an explosion occurred which resulted in loss and impairment of the fingers and thumb of plaintiff's hand.

Defendants' evidence established this battery, one of thousands manufactured by Marathon, was examined and tested before being shipped, and was not and could not be inherently or patently dangerous in any manner, shape or form. Defendants' case was built around the testimony of four qualified experts having special knowledge, both of the component materials and parts and the construction of such batteries. The witness testified no chemical, or combination of chemicals or elements, used in the battery would explode and it was these experts' collective opinion the battery involved did not explode. Thus this action involves an adult who suffered severe, disabling injuries while making proper use of an instrumentality which could not explode.

Before considering controlling issues, certain collateral matters should be mentioned to avoid possibility of decisive questions becoming obscured by nonconclusive principles. First, no consideration is given to the question as to privity of contract between the parties as no issue is made upon this point. Second, although we do not so construe plaintiff's statements, it is to be understood that provisions of the Uniform Sales Act and the recently-adopted Commercial Code are inapplicable, the former not having been adopted in Oklahoma, and the latter because not effective at the time of this accident. However, as urged by plaintiff, the common law has been applied in Oklahoma since Statehood, subject to limitations mentioned in the statute, 12 O.S.1961, § 2. Thus, despite failure to adopt the Uniform Sales Act, our earlier decisions reflect application of the same principles relative to warranty of fitness of personal property sold for a definite purpose, as were incorporated into the Uniform Sales Act, often declared to have been a codification of the common law. See Ransom v. Robinson Packer Co., 120 Okl. 17, 250 P. 119; Pierce v. Crawl, 200 Okl. 27, 190 P.2d 1003.

Neither are we required to consider defendants' argument that the evidence failed to show negligence in manufacture, defective condition when sold, that harm could result when used as intended, or that such alleged negligence or defect was the proximate cause of injury. It is an accepted rule that proof of negligence is unnecessary to establish liability for breach of warranty. 77 C.J.S. Sales § 357. In Simmons v. Wichita Coca Cola Bottling Co., 181 Kan. 35, 309 P.2d 633, p. 635, that Court reviewed earlier decisions based entirely upon the proposition that lack of negligence is no defense to a cause for breach of implied warranty. And in Simmons, the Kansas Court held inadmissible the defendant's proffered evidence showing efficiency of machinery and methods used in manufacture, as well as experimental tests conducted by a chemist, upon the basis that whether reasonable care was used in the manufacturing process was not an issue. Also see Challis v. Hartloff, 136 Kan. 823, 18 P.2d 199.

A further matter merits mention. Defendants' attempt to make the point that plaintiff relied upon his own judgment in personally selecting this battery, hence there could be no implied warranty of fitness for a particular purpose but only an implied warranty of merchantability. In usual connotation "select" means to pick from a group by preference, usually by reason of excellence or other distinguishing feature, and indicates a choice or opportunity to pick out or cull. Webster's New Third International Dictionary; 79 C.J.S., p. 1031; Siegel v. Siegel, 135 N.J. Eq. 5, 37 A.2d 57.

Plaintiff went into the Otasco store which handled Marathon batteries exclusively, paid for a battery from a rack

on the floor and left. It is a fair assumption this rack contained a number of batteries identical in size, capacity and packaging, adequate to meet anticipated demands of retail customers. There was no evidence plaintiff asked for a "Marathon" battery by brand name, that opportunity to make a preferential choice existed, or that plaintiff "selected" this particular battery by choosing it because of excellence or other distinguishing feature. The act of purchasing at random from a trade stock of identical items cannot be classed as a personal selection. We decline to hold such transaction constituted sale of a specified article, under its patent or trade name, which destroyed the implied warranty of fitness because the transaction showed a choice determined by the purchaser which superseded the seller's judgment.

Relative to their principal contention defendants urge that Oklahoma law relative to a manufacturer's liability for breach of implied warranty of fitness has been settled by our holdings in Abbott v. Peppers, 157 Okl. 300, 12 P.2d 203; Hyde Const. Co. v. Stevenson, 181 Okl. 8, 72 P.2d 354; Soter v. Griesedieck Western Brewery Co., 200 Okl. 302, 193 P.2d 575, 4 A.L.R.2d 458. None of these cases involved the pure question of liability by warranty for unfit products placed in channels of trade.

In Abbott, supra, the action sought recovery upon a promissory note secured by a chattel mortgage. On appeal from a justice of peace court judgment defendant pleaded the note had been given for purchase price of seed potatoes which were worthless for the purpose, and consideration for the note therefore had failed. Defendant alleged existence of an express warranty of fitness for the purpose, but the evidence failed to show such warranty. This left only the question whether there was an implied warranty which would remove the case outside the rule of caveat emptor applied in such cases because the seller was not a seed dealer. The conclusion, based upon extended quotation from Mechem On Sales, and particularly Sec. 1315, is a statement of the rule of caveat emptor. The factual circumstances revealed precluded application of a different rule.

In Hyde, supra, the plaintiff sought to recover upon a contract of sale for the purchase price of gravel. The defense of abandonment of the contract was pleaded, in that there was an implied warranty the gravel would meet specifications, and upon failure to meet the test same was abandoned. The evidence showed that the parties entered into the contract of sale after the defendant had certain tests made of the gravel. While the court recognized the rule expressed in Abbott, supra, it is clear the facts precluded application of the rules. The conclusion stated does not support defendants' claim that any sale of a chattel open to inspection precludes possibility of existence of implied warranty.

In Soter, supra, the plaintiff sought damages for injuries sustained from the explosion of a bottle of beer. The petition relied upon acts of negligence and the doctrine of res ipsa loquitur. Plaintiff further alleged breach of warranty of fitness. The decision was based primarily upon failure of the evidence to show negligence of the defendant, and in absence of such negligence plaintiff was not entitled to recover for breach of implied warranty. Availability of res ipsa loquitur was rejected for the reason same was not applicable where the instrumentality was not under defendant's control at the time of the explosion. Defendants say the Court considered the bottle as being open to inspection and thus was referring to latent defects in connection with a showing of the manufacturer's negligence. Cursory examination of the language in Soter, supra, discloses the Court recognized the implied warranty of fitness of the beverage for human consumption, because the manufacturer knows the product will be consumed without inspection and therefore is liable for the contents. But, we refused to apply the same rule to cases involving injury resulting from an exploding bottle "which

may become weakened by the manner and method in which it is handled, or by other circumstances * * * which * * * might cause the bottle to explode."

■ Defendants' basic premise is that expert testimony showed this battery could not and did not explode, but rather that the explosion resulted from an independent or foreign source. Defendants then assert in such a case the controlling rule is that stated in Picker X–Ray Corp. v. General Motors Corp., D.C.Mun.App., 185 A.2d 919, p. 922:

> "There seems to be some confusion in understanding the nature of implied warranty liability. * * * Since the warranty is *implied,* either in fact or in law, no express representations or agreements by the manufacturer are needed. Implied warranty recovery is based upon two factors: (a) The product or article in question has been transferred from the manufacturer's possession while in a 'defective' state, more specifically, the product fails either to be 'reasonably fit for the particular purpose intended' or of 'merchantable quality,' as these two terms, separate but often overlapping, are defined by the law; and (b) as a result of being 'defective,' the product causes personal injury or property damage."

Defendants assert the quoted rule has been applied by our Court to breach of implied warranty as respects the manufacturer, as evidenced by the results of the cases discussed above. Defendants then conclude that (1) under Abbott and Hyde, supra, it has been settled that neither a manufacturer nor retailer impliedly warrants chattels which are open to inspection when sold and so that the doctrine of caveat emptor controls; (2) if the goods contain a latent defect caveat emptor applies as between retailer and consumer (except for food and drug cases) but the manufacturer is liable upon breach of implied warranty; *except,* defendants say under Soter, supra, it must be concluded the bottle or container was open to inspection and this Court was referring to latent defects in connection with

showing the manufacturer's negligence, which would amount to showing a latent defect for which the manufacturer could be liable upon the basis of implied warranty. In our opinion the conclusion based upon this tenuous argument is unsound.

Additionally, defendants urge even if plaintiff had established liability against Marathon for breach of implied warranty in sale of a latently defective product, no recovery could be had against the other defendants in view of our extension of the exception to the rule of caveat emptor as advanced in John A. Brown, Inc. v. Shelton, Okl., 391 P.2d 259. They state that in extending the food and drug exception to the doctrine we recognized that generally the retailer is not responsible upon implied warranty for a latently defective product. The conclusion is that in Oklahoma a retailer has no absolute liability for a latently defective product; and this battery does not come within the exception to caveat emptor announced in Shelton, supra.

The battery here involved properly may be considered a sealed container, but not comparable to containers involved in bottle explosion cases which permit some degree of inspection. Extensive expert testimony described and defined the physical elements from which manufactured. Most of these elements were supplied to Marathon in bulk and then mixed and formed as needed. The carbon post, an integral element of each battery cell, was purchased in usable state from an unidentified supplier. This particular type of battery was formed by four separate cylindrical cells which were connected and sealed together with wax. The unit then was placed in a cardboard container, bearing the description, identifying information and defendant's name. The complete battery then was sealed by asphalt poured over the top. Only the outside container, the asphalt sealant and the connecting posts were exposed to view. Nothing inside the contrivance or under the asphalt seal was exposed or permitted any inspection. No degree of inspection

which plaintiff might have attempted would have provided a basis for exercise of judgment upon his part. The very nature and composition of the battery was such as to preclude applicability of the rule that no implied warranty can exist where the thing sold is open to the purchaser's inspection and examination.

The defense was that the battery could not explode, therefore the explosion which occurred resulted from outside agency or force. It is settled law that the weight to be given to expert testimony is for the jury, who may follow their own experience, observation and common knowledge and reject the opinions of experts. Peppers Refg. Co. v. Spivey, Okl., 285 P. 2d 288; Oklahoma Turnpike Authority v. Bacon, Okl., 318 P.2d 442.

In Otis Elevator Co. v. Robinson (CCA 5), 287 F.2d 62, essentially the same defense was urged as is relied upon by defendants in the present case, and the Court said, p. 64:

"Of course this is not the first time that something has occurred that simply could not have happened. The more complex becomes our machine age civilization the more this becomes evident. * * *

"The weakness of the defense by Otis before the jury, as well as the development of its legal theory here, is that in the final analysis it is really the assertion that the accident never happened.

*      *      *      *      *

"But the jury saw and heard Robinson. * * * It was entitled to, and did, find that the accident happened just as Robinson said it did.

*      *      *      *      *

"There was a solid basis for jury inferences from circumstances which have a compelling attraction in the ordinary experience of men. That was enough."

Turning to the matter of the warranty involved, it is appropriate to note that the legal controversies resulting from application of the theory of implied warranty are too numerous to permit citation and discussion. Recent consideration of various phases of the problem may be reviewed in: Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1; Taylor v. Jacobson, 336 Mass. 709, 147 N. E.2d 770, 76 A.L.R.2d 1; Gottsdanker v. Cutter Laboratories, 182 Cal.App.2d 602, 6 Cal.Rptr. 320, 79 A.L.R.2d 290; Greenman v. Yuba Power Products, Inc., 59 Cal. 2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, and numerous authorities therein collected; also Greeno v. Clark Equipment Co., D.C., 237 F.Supp. 427; Putman v. Erie City Mfg. Co., 5 Cir., 338 F.2d 911; Dagley, Adm. v. Armstrong Rubber Co., 7 Cir., 344 F.2d 245.

In Ryan v. Progressive Grocery Stores, 255 N.Y. 388, 175 N.E. 105, 74 A.L.R. 339, Cardozo, J., observed that the distinction between warranty of fitness for a particular purpose and of merchantability in many instances is practically meaningless. Later, in Henningsen, supra, the New Jersey Court stated that liability to the ultimate consumer (absent direct contractual connection) had come to be predicated upon three theories: (1) warranty running with the article just as a covenant running with the land; (2) third party beneficiary; (3) that public policy requires recognition of a warranty made directly to the consumer. And, in Jacob E. Decker & Sons v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479, (a food case) the Texas Court departed from recognized considerations, and held that breach of a manufacturer's warranty of fitness for human consumption required no privity of contract, *the warranty being implied by law as a matter of public policy.* Also see Ford Motor Co. v. Mathis (CCA 5), 322 F.2d 267; Putman v. Erie City Mfg. Co. et al. (CCA 5), 338 F.2d 911.

In Greenman v. Yuba Power Products, Inc., supra, the California Court declared the rule:

"* * * A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes in-

jury to a human being. Recognized first in the case of unwholesome food products, such liability has now been extended to a variety of other products that create as great or greater hazards if defective. * * *

"Although * * * strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law (citing cases) * * *, and the refusal to permit manufacturer to define the scope of its own responsibility for defective products (citing cases) make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products unless those rules also serve the purposes for which such liability is imposed.

  *   *   *   *   *   *

" * * * The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. * * *"

The California Court explicitly held it was sufficient to establish a manufacturer's liability when it was shown that plainiff, while using the machine involved in the way it was intended to be used, was injured as the result of a defect in design or manufacture which made the machine unsafe, and of which defective condition the plaintiff was unaware.

█ We are persuaded as to the correctness of both the reasoning and the rule, and hold the manufacturer's liability was established when it was shown that plain-

tiff was injured while using the battery for the purpose intended by reason of a defect as to which he was not aware, and could not have ascertained by examination.

█ Defendants next assert reversible error in that the trial court failed to define the issues involved in the case when instructing the jury. The trial court read the pleadings and advised the jury same were not evidence but merely formed the issues to be tried. The argument is that in Lambard-Hart Loan Co. v. Smiley, 115 Okl. 202, 242 P. 212, it was held reversible error to submit voluminous pleadings to the jury without stating the issues in the instructions given, thus leaving the jury to determine the issues. As a correct statement of general law this is correct. It has been pointed out to trial courts that it is not good practice to formulate the issues by reading at large from the pleadings. Trial courts should be extremely wary of the risk of error involved in such practice. However, in view of matters discussed hereafter, we hold that the trial court's action in this instance was not such as to require reversal.

█ The fifth proposition urged for reversal is predicated upon error allegedly inhering in giving Instructions Nos. 2, 3, 4, 8 and 9. Argument in defendants' brief relates to Instructions 2, 3 and 8. As to the claim that Instruction 3 was improper because the evidence failed to show any effort on defendants' part to "sell" this battery to plaintiff, so there could be no implied warranty by Otasco, such argument does not now appear to require consideration.

Instruction 2 advised the jury if it found the battery exploded so as to jeopardize plaintiff because of some inherent quality or characteristic in the battery or materials it was inherently dangerous, and if inherently dangerous, then not suitable for the purpose for which designed and sold. Although it may be conceded the instruction is a loose exposition of the issue, the matter which the jury was required to determine was whether a damaging ex-

plosion of the battery occurred. Defendants' insistence that there was no evidence the battery exploded, and that the only evidence was that it would not and could not explode, is nothing more than a continuation of argument that the expert testimony must be accepted as true. The definition of inherently dangerous which defendants quote from the headnote in 74 A.L.R. 2d 1146, arises from the former need for holding privity of contract unnecessary for there to be recovery against either seller or manufacturer. No issue of privity of contract is present in this case.

The complaint as to Instruction No. 8 is that it allowed the jury to allow recovery for pain and suffering "if any", despite the fact there was no competent evidence of future pain and suffering. Defendants construe the physician's testimony that there was a "possibility" of future pain and suffering as lacking in probative value, which, therefore, left this matter to the jury's speculation. This argument overlooks the physician's explanation as to the reason plaintiff might develop pain in the future, and plaintiff's testimony at the trial that he suffered pain on occasions. In St. Louis & S. F. Ry. Co. v. Simmons, 119 Okl. 1, 245 P. 894, it was held that a plaintiff was a competent witness to testify as to pain and suffering endured. And, when coupled with medical testimony that the injury "probably" was permanent, was sufficient to support submission of the issue of pain and suffering to the jury.

In this same connection, defendants' Proposition 9 urges error in assessment of excessive damages under influence of passion and prejudice. The plea is that there was no evidence of future pain and suffering, and since the medical testimony fixed disability from the injury at 50 per cent of plaintiff's hand, the fact the verdict returned was for half the amount sued for plainly demonstrated presence of passion and prejudice. There is no absolute standard to measure damages for personal injuries, and a wide latitude of discretion is left to the jury. Booth Tank Co. v. Symes,

Okl., 394 P.2d 493. In Shebester, Inc. v. Ford, Okl., 361 P.2d 200, it was held that the measure of damages for permanent injuries includes impairment disability in health, mind and person. The permanent and disfiguring nature of plaintiff's injury is unquestioned, as well as the fact such constitutes impairment of a physical function and capacity which is of importance in the life of every person. The jury did not separate the items for which damages were awarded. The verdict, however, was within the permissible limits of the items claimed, and cannot be denominated excessive under the evidence. Also see Haco Drilling Co. v. Burchette, Okl., 364 P.2d 674; Moody v. Childers, Okl., 344 P.2d 262.

Proposition 6 urges error in the trial court's refusal to give 11 instructions requested by defendants. Requested Instructions 2 and 3 raised questions of the jurisdiction over Otasco and Marathon, and do not require discussion. Requests Nos. 1, 4, 6, 14 and 15 each presented questions based upon the presumed lack of danger from the battery, and that the jury should find same did not explode. The practical effect of each was, as with Instruction No. 1, to request an instructed verdict for defendants, and requires no further discussion. Instruction 5 requested the court to advise the jury the retailer owed no duty to inspect for latent defects. Our conclusion makes consideration of the argument relative to this matter unnecessary.

Under Request No. 7 defendants sought to advise the jury that plaintiff was required to show the explosion was due to defects in the battery and not by the manner in which handled after it came into plaintiff's possession. Such request obviously was an effort to apply the rule in the Soter case, supra, and in view of the conclusion reached, properly was refused.

Requested Instruction No. 8 was based upon the theory Otasco made no representations concerning the battery, but rather that plaintiff selected the battery and under such circumstances Otasco could not be re-

sponsible upon the theory of implied warranty. Such request properly was refused under the circumstances and evidence surrounding the plaintiff's purchase, and our holding here that purchase of an article from retail stock and not by trade name where there is no opportunity of choice cannot be held to constitute a "selection" by the purchaser.

Defendants' seventh proposition is the contention that the trial court refused to submit their theory of defense to the jury. It is argued that the defense was the battery could not and did not explode, and that this was positively established by expert testimony. Thus defendants urge that, under the law, they were entitled to an instruction that the Marathon battery could not have exploded and the jury should return a verdict for defendants. Again, this argument amounts to nothing more than a claim the court should have directed a verdict for defendants.

The jury was instructed if the evidence showed no breach of implied warranty, and the battery was reasonably fit for the uses intended when purchased by plaintiff, then the verdict should be for defendants. The primary issue involved was whether the battery exploded, and this matter explicitly was submitted to and determined by the jury. We have held consistently that in civil cases the facts are provable by direct or circumstantial evidence, or by both. And it is not required that the proof rise to that degree of certainty which will support only one conclusion to the exclusion of all others. See Chickasha Cotton Oil Co. v. Hancock, Okl., 306 P.2d 330, and cases cited. The issues raised by the pleadings and supported by defendants' evidence were submitted for the jury's consideration in a sufficient and proper manner.

Finally, defendants contend prejudicial error resulted from conduct of plaintiff's counsel which occurred within the jury's presence, and prevented defendants from having a fair trial. Initial complaint is made of the fact that while the battery involved was sitting on a railing, defendants' counsel admonished a juror not to let it fall, and plaintiff's counsel rejoined that it "might blow up". Objection was made to counsel's remark as prejudicial and the trial court instructed the jury to disregard such statement. The plea now is that the remark was so prejudicial the trial court's admonition did not cure the error. We do not believe such remark was weighted with the significance now sought to be attributed thereto, particularly because defense counsel recognized and admitted to the jury during course of the trial that an explosion had occurred. The trial court promptly sustained defendants' objection to the side-bar remark made by plaintiff's counsel and admonished the jury not to consider such remark. It is less to be condoned in cases where objectionable remarks are elicited from counsel than where such remarks come from laymen. The crucial question, however, always is whether actual prejudice has resulted from such a remark. We are of the opinion any error resulting from counsel's unjustified statement, although perhaps involuntary, was cured by the trial court's prompt admonition to the jury. See Andrews v. Moery, 205 Okl. 635, 240 P.2d 447; Hazelrigg Trucking Co. v. Duvall, Okl., 261 P.2d 205.

Defendants also complain of questions asked during trial and remarks by plaintiff's counsel during closing argument, wherein reference was made to cans of poison tuna fish, cases involving thalidomide, and polio vaccine. Defendants urge such remarks were improper and prevented defendants from having a fair trial.

The remarks relative to poison tuna fish were made during cross-examination of an expert witness in an effort to establish that it was possible for defects to be present in manufactured products no matter how carefully inspection was made in an effort at quality control. The other matters mentioned occurred during arguments of counsel. The court sustained objection to counsel's reference to tuna fish

without admonishing the jury to disregard the question, although observing the purpose thereof would be nothing more than an effort to show percentages. The trial court's recognition of the reason for such questions and ensuing explanation to the jury, was sufficient to remove the stigma of possible prejudice from such questioning, at least to the extent that failure thereafter to admonish the jury cannot be considered as resulting in irreparable harm to defendants. The record shows counsel for both parties chose to mention this matter in their arguments and did so without objection. The clear showing of prejudice necessary to support reversal of a jury verdict is not present here. Hazelrigg Trucking Co. v. Duvall, supra.

Reversed in part and affirmed in part. (Judgment reversed as to defendant Oklahoma Tire & Supply Company).

WILLIAMS, BLACKBIRD, IRWIN and HODGES, JJ., concur.

HALLEY, C. J., and LAVENDER, J., concur in part and dissent in part.

JACKSON, V. C. J., and DAVISON, J., dissent.